

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-28-2000

# Paff v. Kaltenbach

Precedential or Non-Precedential:

Docket 99-6025

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation
"Paff v. Kaltenbach" (2000). *2000 Decisions.* Paper 36.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/36

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 28, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 99-6025

JOHN PAFF; JAMES TIMOTHY KONEK, Individuals,
Appellants

v.

GEORGE KALTENBACH, in his individual and official
capacities; JOHN DOES 1-3; THE TOWNSHIP OF
EAST BRUNSWICK

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civil Action No. 97-cv-01197)
District Judge: Honorable Joseph A. Greenaway, Jr.

Argued June 18, 1999

BEFORE: NYGAARD, COWEN and STAPLETON,
Circuit Judges

(Filed February 28, 2000)

        Richard F. Collier, Jr.
        Christopher Walsh (Argued)
        Collier, Jacob & Mills
        580 Howard Avenue
        Corporate Park III
        Somerset, NJ 08873
         Attorneys for Appellants

George Wilgus, III (Argued)
Lenox, Socey, Wilgus, Formidoni
 & Casey
3131 Princeton Pike
Trenton, NJ 08648
 and
Joseph J. Benedict
Benedict & Altman
247 Livingston Avenue
New Brunswick, NJ 08901
 Attorneys for Appellees

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Appellants are two political activists who were arrested for criminal trespassing while distributing Libertarian Party literature outside the post office in East Brunswick, New Jersey. They brought suit against Kaltenbach, the arresting officer, under 42 U.S.C. S 1983, alleging a violation of their constitutional rights, as well as violations of state tort law. The District Court entered summary judgment for the defendant police officer on grounds of qualified immunity. We will affirm.

I. FACTS AND PROCEDURAL HISTORY

Plaintiff-Appellants John Paff and James Konek are officers of the Libertarian Party of Somerset and Middlesex Counties in New Jersey. The Libertarian Party is a national organization that advocates a free-market economy and seeks to "roll back the size of government by replacing taxes with voluntary user fees for governmental services." To this end, the Party sponsors peaceful demonstrations each year on April 15, tax day, to protest the tax burdens imposed on American citizens and illustrate the Party's opposition to taxes and to the Internal Revenue Service. The demonstrations are held each April 15th evening, throughout the United States, in front of post office buildings where taxpayers go to mail their tax returns.

2

In order to assist in the organization of these rallies, the Libertarian National Committee has developed a "Million Dollar Tax Day Outreach" package, which is provided to Party representatives and contains tips on how to ensure an "effective outreach-oriented protest." The mainstay of the protest is the distribution of mock $1,000,000 bills, which are printed to resemble a Federal Reserve note and, on the reverse side, prominently state: "The U.S. Government Spends $1,000,000 Every Five Seconds." The fake bill also contains additional information about federal government appropriations and a coupon designed to be clipped and mailed in for more information about the Libertarian Party.

The Outreach Package, designed for the organizers of such events, contains information about printing these leaflets, selecting a post office, managing volunteers, distributing press releases, etc. In a section entitled "Problems," the package advises leafletters not to block the entrance of the post office; to pick up dropped leaflets; to hand out literature to people as they are leaving, rather than entering, the post office; and to avoid "unnecessary disputes" with post office officials. In the event post office officials attempt to remove the demonstrators, the package contains a "Legal Memo" expressing the view that the demonstrators have a legal right to distribute literature on post office property. In this instance, Paff, Chairman of the local chapter's Political Awareness Committee, also personally researched the relevant law and concluded that their planned tax day protest did not violate postal regulations and was in fact protected by the First Amendment.

On April 10, 1996, Paff mailed a letter to the Postmaster of the East Brunswick, New Jersey Post Office, signed by the local party chairperson, advising the Postmaster that they planned to conduct a tax day protest "on the grounds of your facility on the evening of April 15th," and enclosing a press release describing the event. The letter further explained they had been advised by the national party leaders that the planned activities were completely lawful and asked that "[i]f you have a different opinion on this matter, please advise me prior to the event." The Postmaster did not reply.

On April 15, 1996, the East Brunswick postal branch remained open until midnight to permit its patrons to file their 1995 tax returns. At approximately 9:00 p.m. that evening, Paff, Konek, and three other tax protesters stood on the postal sidewalk area, between the parking lot and the front door of the post office. As the postal customers exited the building, Paff, Konek, or another party member approached some of them and handed them a prepared leaflet.

Shortly after the commencement of the leafleting activity, the Postmaster, Steve Leddy, emerged from the post office and told Paff that he and the other protesters would have to move to the public right-of-way, along Cranbury Road. The East Brunswick postal building is set back approximately 75 feet from the nearest thoroughfare, Cranbury Road, which has no adjoining sidewalk. Postal customers enter the building via an access road that connects with Cranbury Road and depart the facility through another access road. As such, the sidewalk area where plaintiffs stood is designed specifically to facilitate access by postal customers to the post office from the parking area. Two newspaper vending machines are located on this sidewalk area.

Upon being instructed to move to Cranbury Road, Paff explained to the Postmaster that he had researched the matter and that he and his fellow protesters had a constitutional right to remain there. Leddy then re-entered the postal facility and proceeded to call the police. Paff, Konek, and the others continued to distribute leaflets.

Shortly thereafter, Officers Kaltenbach and Koslowski were dispatched to the scene. Upon their arrival, Leddy introduced himself, identified the protesters, and informed the officers that he had instructed the protesters to move to the public thoroughfare along Cranbury Road, but they had refused. Leddy told the officers that, by using the postal sidewalk, the protesters were a potential obstruction to customers entering and exiting the building on postal business. Kaltenbach told Leddy that if the protesters refused to move, and if Leddy would sign a complaint, Kaltenbach would arrest them. Leddy agreed to sign a complaint.

4

Kaltenbach then told the protesters that they could move to the public right-of-way beside Cranbury Road, but if they remained on the postal sidewalk, they would be arrested. Paff explained that he and his fellow protesters had a constitutional right to distribute leaflets in front of the post office building. Kaltenbach repeated that if they did not move, he would arrest them. Paff said that he was the "designated arrestee" and that Kaltenbach should arrest him because he would not move; thereafter, all of the protesters except Paff and Konek left the area.

Kaltenbach then called his lieutenant and explained the situation, indicating that he was going to have to arrest two of the protesters for trespass. The lieutenant told Kaltenbach to bring the Postmaster back to headquarters to sign the complaint. Kaltenbach proceeded to arrest both Paff and Konek and brought them back to police headquarters, along with Postmaster Leddy. Kaltenbach also arranged for Konek's car, which was parked at the postal facility, to be towed and impounded. At the lieutenant's direction, Kaltenbach himself signed the complaints, charging Paff and Konek with defiant trespassing, in violation of N.J. Stat. S 2C:18-3(b)(1).1 After their arrest and booking, bail was set at $5,000, Paff and Konek posted bail and were released at 3:00 a.m. the next morning, April 16, 1996.

On September 17, 1996, at the request of the East Brunswick prosecutor, the East Brunswick Township Municipal Court dismissed the charges against Paff and Konek. The prosecutor explained that, although Leddy initially requested police assistance and indicated his willingness to sign the complaints for the arrest of Paff and Konek, Leddy thereafter learned of an internal Postal Service policy not to prosecute trespassers unless there has been a physical obstruction of the postal facility.

_____

1. The defiant trespass statute provides, in pertinent part, that a "person commits a petty disorderly offense if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given by . . . actual communication to the actor." N.J. Stat. S 2C:18-3(b)(1) (West 1999).

5

Paff and Konek subsequently brought suit in U.S. District Court against Kaltenbach, alleging violations of S 1983 and state tort law. Specifically, plaintiffs alleged that their arrest violated their First Amendment right to distribute leaflets on the post office sidewalk; that Kaltenbach arrested them without probable cause, in violation of the Fourth Amendment; that Kaltenbach participated in setting excessive bail in violation of the Eighth Amendment; and that Kaltenbach's impoundment of Konek's car amounted to a deprivation of property without due process in violation of the Fourteenth Amendment. In addition, plaintiffs presented common law claims against Kaltenbach for false arrest, malicious prosecution, and conversion (of Konek's vehicle).

Following discovery, the plaintiffs moved for summary judgment as to liability against Kaltenbach, and Kaltenbach filed a cross-motion for summary judgment on all claims against him. The District Court granted summary judgment to plaintiffs only on their claim that the impoundment of Konek's vehicle was improper. As to plaintiffs' First Amendment claim, the Court found that plaintiffs had a right, protected by the First Amendment, to leaflet on the postal sidewalk. The Court granted summary judgment to Kaltenbach, however, because it found he was entitled to qualified immunity. As to plaintiffs' Fourth Amendment claim, the Court found that, based on the advice Kaltenbach received from Leddy, he had probable cause to arrest plaintiffs. On all remaining claims, the District Court also granted summary judgment to Kaltenbach.[2]

This appeal followed. This Court exercises plenary review over a District Court's entry of summary judgment, including its determination of a law enforcement officer's entitlement to qualified immunity. See In re: City of Philadelphia Litigation, 49 F.3d 945, 960 (3d Cir. 1995).

_____

2. In addition to the First and Fourth Amendment claims discussed herein, plaintiffs make two other assertions of error, which we find to be without merit. Specifically, plaintiffs argue that the District Court erred in failing to find that (1) Kaltenbach falsely arrested and maliciously prosecuted plaintiffs, thereby entitling plaintiffs to punitive damages; and (2) Kaltenbach violated plaintiffs' Eighth Amendment rights by imposing an excessive bail requirement on them.

II. THE FIRST AMENDMENT CLAIM

Under the doctrine of qualified immunity, government officials performing discretionary functions are"shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Under Siegert v. Gilley, 500 U.S. 226, 232 (1991), before a court even addresses a claim of qualified immunity, however, it first should determine whether the facts alleged by the plaintiff constitute a "violation of a constitutional right at all." In this case, the District Court determined that, under Int'l Society for Krishna Consciousness, Inc. v. Lee , 505 U.S. 672 (1992) ("Lee") and United States v. Kokinda, 497 U.S. 720 (1990), Paff and Konek had a constitutional right under the First Amendment to distribute political literature on postal property and that the facts alleged revealed a violation of that right. Because appellees did not cross-appeal this determination, the only issue before us on appeal is the propriety of the District Court's ruling that Kaltenbach was entitled to qualified immunity. See Assaf v. Fields, 178 F.3d 170, 174 (3d Cir. 1999).

A court presented with a claim of qualified immunity must examine both the law that was clearly established at the time of the alleged violation and the facts available to the official at that time, and must then determine, in light of both, whether a reasonable official could have believed his conduct was lawful. See Good v. Dauphin County Social Serv. for Children and Youth, 891 F.2d 1087, 1092 (3d Cir. 1989). Accordingly, we first examine the state of the relevant law at the time of the arrest of both Paff and Konek and then turn to an analysis of the information available to Kaltenbach at that time. The ultimate issue will then be whether, given the established law and the information available to Kaltenbach, a reasonable law enforcement officer in Kaltenbach's position could have believed that his conduct was lawful.

The Supreme Court has "adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property

for other purposes. Accordingly, the extent to which the Government can control access depends on the nature of the relevant forum." Cornelius v. NAACP Legal Defense & Educational Fund, Inc., 473 U.S. 788, 800 (1985). When the relevant public property is determined to be a "non-public forum," rather than an "open forum" or a"designated forum," the government has greater freedom to restrict speech. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37 (1983).

In United States v. Kokinda, 497 U.S. 720 (1990), the Supreme Court upheld the constitutionality of postal regulations that prohibited the solicitation of"alms and contributions" on post office property.3 In the course of its analysis, a four-Justice plurality determined that a post office sidewalk was a non-public forum. The sidewalk, like the sidewalk here, was located between the parking lot and the post office, at some distance from the nearby road, and was constructed solely to assist patrons of the post office.4

_____

3. In full, the postal regulation upheld in Kokinda provides:

> Soliciting alms and contributions, campaigning for election to any public office, collecting private debts, commercial soliciting and vending, and displaying or distributing commercial advertising on postal premises are prohibited.

39 C.F.R. S 232.1(h)(1) (1989).

4. Rejecting the argument that the postal sidewalk is indistinguishable from the municipal sidewalk that runs along side the road, the Kokinda Court explained:

> The postal sidewalk at issue does not have the characteristics of public sidewalks traditionally open to expressive activity. The municipal sidewalk that runs parallel to the road in this case is a public passageway. The Postal Service's sidewalk is not such a thoroughfare. Rather, it leads only from the parking area to the front door of the post office. Unlike the public street described in Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640 (1981), which was "continually open, often uncongested, and constitute[d] not only a necessary conduit in the daily affairs of a locality's citizens, but also a place where people[could] enjoy the open air or the company of friends and neighbors in a relaxed environment," id., at 651, the postal sidewalk was constructed solely

to provide for the passage of individuals engaged in postal business.

8

Because the sidewalk was a non-public forum, the plurality concluded that the "government's decision to restrict access . . . need only be reasonable." Id. (quoting Cornelius, 473 U.S. at 806). The prohibition was found to be reasonable "because solicitation is inherently disruptive of the Postal Service's business." Id. at 732. Justice Kennedy, concurring, found the regulations constitutional even if the sidewalk was a public forum, as the dissenters contended.

In United States v. Bjerke, 796 F.2d 643 (3d Cir. 1986), this Court foreshadowed the ruling in Kokinda when it upheld the constitutionality of the same postal regulation. Like the Kokinda plurality, the Bjerke court also found the postal sidewalk at issue in that case to be a non-public forum and rejected the argument that the presence of "newspaper vending machines and a gumball machine encouraging charitable contributions" converted the area into a public forum. As the court there explained,"that the government permits selective access to a nontraditional forum does not manifest an intent to designate an area a public forum for all expressive purposes." Id. at 649. We held that it was not unreasonable for postal officials to believe that solicitation held the potential for interference "with their mission to provide reliable postal services." Id. at 650.

Since Bjerke and Kokinda, both of which addressed bans on solicitation, a restriction on leafleting was considered by the Supreme Court in Lee v. Int'l Society for Krishna Consciousness, Inc., 505 U.S. 830 (1992) (incorporating concurring opinions at 505 U.S. 672 (1992)). In Lee, the Court considered both a ban on the solicitation of funds

_____

        The sidewalk leading to the entry of the post office is not the
        traditional public forum sidewalk referred to in Perry. Nor is the
        right of access under consideration in this case the quintessential
        public sidewalk which we addressed in Frisby v. Schultz, 487 U.S.
        474 (1988) (residential sidewalk). The postal sidewalk was
        constructed solely to assist postal patrons to negotiate the space
        between the parking lot and the front door of the post office, not
to
        facilitate the daily commerce and life of the neighborhood or city.

Kokinda, 497 U.S. at 727.

9

within the airports of the New York/New Jersey Port Authority, as well as a ban on the "repetitive distribution of printed or written materials." It concluded that the airport terminals were non-public fora, applying the reasonableness standard, despite the fact "that the public spaces in the airports are broad, public thoroughfares full of people and lined with stores and other commercial activities." 505 U.S. at 700 (Kennedy, J., concurring). The Court upheld the solicitation ban but struck down the leafleting ban. The challenged leafleting regulation was a complete and permanent prohibition on the "sale or distribution of flyers, brochures, pamphlets, books or any other printed or written material," if conducted within the airport terminal, "in a continuous or repetitive manner."

The leafleting issue was resolved in a per curiam opinion that cited "the reasons set forth in the opinions of " Justices O'Connor, Kennedy and Souter filed in the appeal relating to the ban on solicitation. Central to the reasoning of all three was the view that, in contrast to "discrete, single purpose facilities" like the post office in Kokinda, the airports were "operating a shopping mall as well as an airport." 505 U.S. at 688-89. For the majority of justices who had concluded that the non-public forum analysis was appropriate, "the reasonable inquiry, therefore,[was] not whether the restrictions on speech are `consistent with . . . preserving the property for air travel, . . . but whether they [were] reasonably related to maintaining the multi-purpose environment that the Port Authority [had] deliberately created." Id. at 689. The Court held that they were not.

Finally, reference to Perry Educ. Ass'n v. Perry Local Educators Ass'n, 460 U.S. 37 (1983) (upholding rule granting teachers' bargaining representative exclusive access to teacher mailboxes and the interschool mail system to the exclusion of a rival union), and Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788 (1985) (upholding executive order limiting participation in a charity drive aimed at federal employees and military personnel), is appropriate. In each, the relevant forum was found to be a non-public one. In each, the issue for decision was whether the public agency involved was reasonable in believing that the prohibited expression might

10

interfere with its mission, and in each, the party attacking the restraint stressed that there was no evidence of actual interference having occurred. In Perry, the Court responded by acknowledging that there was "no showing in the record of past disturbances stemming from [the prohibited] access" to the forum "or evidence that future disturbances would be likely." Nevertheless, it pointed out that the Court had "not required that such proof be present to justify the denial of access to a non-public forum on grounds that the proposed use may disrupt the property's intended function." Perry, 460 U.S. at 52 n.12. In Cornelius, the Court responded "that the Government need not wait until havoc is wreaked to restrict access to a non-public forum." 473 U.S. at 810.

The existing caselaw at the time of the arrests thus clearly established a number of relevant principles. First, a sidewalk like the one involved here is a non-public forum. This follows from Kokinda, Bjerke, and, a fortiori, from Lee. Second, a public agency may place reasonable restrictions on speech in a non-public forum. Third, "a restriction on speech in a non-public forum is `reasonable' when it is `consistent with the [government's] legitimate interest in preserv[ing] the property . . . for the use to which it is lawfully dedicated." Lee, 505 U.S. at 688 (quoting Perry). And finally, restrictions on speech in a non-public forum may be imposed if it is reasonable to anticipate that interference with the mission of the agency may occur, even though it has not yet occurred.

We now turn to the information available to Kaltenbach at the time of the arrests. As soon as Kaltenbach arrived on the scene, Postmaster Leddy identified himself as the official responsible for the premises and the carrying out of the mission of the postal facility. It was an extraordinary evening for that postal facility; it was still open at 9:00 P.M. because midnight was the deadline for postmarking tax returns. Accordingly, a heavy public utilization of the postal facility could be expected. Leddy explained to Kaltenbach that the protesters were a potential obstruction to customers entering and exiting the building on postal business and that they could not remain on the postal sidewalk. In the event the protestors refused to move their distribution to the public rights-of-way, Leddy said he

11

would come to police headquarters and sign a complaint so that charges could be pressed against the protesters. Kaltenbach then confronted the protestors and learned that they claimed to have a constitutional right to distribute leaflets on the sidewalk. They refused to withdraw to the public roadway, and he made his decision to arrest.

This brings us to the issue of whether, given the established law and the information available to Kaltenbach, a reasonable law enforcement officer in his position could have believed his conduct was legal. We agree with the plaintiffs that a reasonable law enforcement officer in Kaltenbach's position would have known, based on Kokinda and Lee, that the protestors could be precluded from distributing leaflets on the post office sidewalk only if it was reasonable under all of the circumstances for the postal authorities to prohibit that activity. However, we do not believe that a reasonable officer would understand the caselaw to mandate a conclusion that the restriction here imposed was unreasonable. While Lee struck down a prohibition on leafleting in large airports, there are material distinctions between the situation there addressed and the one that faced Kaltenbach. The purpose to which the property is dedicated is crucial to the reasonableness analysis, and as the Supreme Court itself noted, the purpose to which the airports in Lee were dedicated was far different from that of a sidewalk between a post office and its parking lot. Moreover, the ban on leafleting in Lee was a permanent one. The ban imposed by Leddy and enforced by Kaltenbach was a temporary, one time measure to address an extraordinary situation which Leddy said held the potential for interfering with the mission of the facility.

In our view, a reasonable law enforcement officer with knowledge of the relevant legal principles and the information available would have done exactly what Kaltenbach did here. Given the postmaster's responsibility for and experience with the postal facility, it was reasonable for Kaltenbach to accept his judgment that the leafleting activity, if continued, would impede the public in making timely use of the postal facility. And given that factual predicate, Kaltenbach had every reason to believe that the restraint imposed was a constitutionally valid one.

Leddy was a public officer whom Kaltenbach could reasonably presume to be familiar with the conditions likely to be encountered at the facility on that evening. For example, more so than any officer just arriving on the scene, a postmaster could be expected to know relevant facts, like how much customer traffic through the postal facility is to be expected between 9 P.M. and midnight on April 15th, the extent to which conflicts have erupted in the past between protesters and customers on postal property, and whether protesters have previously leafleted effectively along the public right-of-way on Cranbury Road. Such facts were necessary to an analysis of the reasonableness of the restriction Leddy sought to impose. To require an officer to assess the reasonableness of a restriction such as this one without reference to the postmaster's unique knowledge would strip the determination of the very facts essential to its making.

We do not, of course, suggest that a law enforcement officer will always act reasonably in relying on the facts provided by a custodian of public property. We hold as we do because the applicable law required a detailed factual assessment; the facts necessary to make that assessment were otherwise unavailable to Kaltenbach; and there was no reason to question the good faith of the custodian. Contrary to plaintiffs' suggestion, we do not believe a reasonable law enforcement officer would have second-guessed the Postmaster simply because no actual obstruction of the sidewalk had yet occurred. As we noted earlier, "the Government need not wait until havoc is wreaked to restrict access to a non-public forum." Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788, 810 (1985).5

_____

5. The applicable postal regulations prohibit any activity "which obstructs the usual use of entrances . . . or which impedes or disturbs the general public in transacting business or obtaining the services provided on [post office] property . . . ." 39 C.F.R. S 232.1(e). As we read
these regulations, they anticipate that local postmasters will be required to exercise discretion as to whether particular conduct in particular circumstances is likely to "obstruct," "impede," or "disturb." The regulations expressly authorize "[l]ocal postmasters . . . [to] enter into agreements with State and local enforcement agencies to ensure that the

In sum, Kokinda and Lee clearly establish that reasonable restrictions on speech on postal property are permissible. Because we believe a reasonable officer would, and in fact should, consider the views of the postmaster in this situation, we have no difficulty concluding that Kaltenbach could have believed the restriction imposed here was reasonable, and that his own conduct was therefore lawful. Thus, Kaltenbach is protected by the doctrine of qualified immunity with respect to the plaintiffs' claimed violation of their First Amendment rights.

III. THE FOURTH AMENDMENT CLAIM

The Fourth Amendment prohibits a police officer from arresting a citizen without probable cause. See Orsatti v. New Jersey State Police, 71 F.3d 480, 482 (3d Cir. 1995) (citing Papachristou v. City of Jacksonville, 405 U.S. 156 (1972)). After their arrest, plaintiffs were charged with violating New Jersey's criminal defiant trespass statute. N.J. Stat. S 2C:18-3(b)(1) (West 1999).6 Under this statute, "[a] person commits a petty disorderly offense if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given by . . . actual communication to the actor." Id.

_____

. . . rules and regulations are enforced." Id. S 232.1(q)(2). There is thus authority that Postmaster Leddy could cite in support of his right to make the decision he made on the evening in question. Accordingly, it is not at all clear to us, as it is to the dissent, that the activity of Paff and Konek at the time of their arrest was "indisputably legal." We stress, however, that we have no occasion to address here whether Postmaster Leddy violated the First Amendment or whether, if sued, he would be entitled to qualified immunity. We hold only that, given the clearly established law and the information available to Kaltenbach, a reasonable law enforcement officer in his position could have believed his conduct was lawful.

6. "Probable cause need only exist as to any offense that could be charged under the circumstances." Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994) (emphasis added). However, the defiant trespass statute is the only statute to which Kaltenbach points as justification for the arrests.

14

Plaintiffs contend that there was no probable cause to believe that they were committing this offense. 7

Plaintiffs' argument is straightforward. They observe that an essential element of the offense for which they were arrested is that the alleged trespasser subjectively knew he was not licensed or privileged to be on the property in question. See, e.g., State v. Santiago, 527 A.2d 963, 965 (N.J. Super. Ct. Law Div. 1986) (conviction reversed where reasonable doubt existed as to whether defendant subjectively knew she was not privileged to enter). Paff and Konek insist that according to the undisputed evidence regarding the facts available to Kaltenbach at the time of

_____

7. In their briefs before this Court, Paff and Konek maintain that "Officer Kaltenbach also lacked probable cause to arrest[them] because the state criminal statute pursuant to which he made the arrest does not criminalize the activities at issue on postal property." Brief for Appellants at 35. To support their argument, plaintiffs rely on the Assimilative Crimes Act, 18 U.S.C. S 13(a), which provides that:

> Whoever within or upon any [federal enclave], is guilty of any act or
> omission which, although not made punishable by any enactment of
> Congress, would be punishable if committed or omitted within the
> jurisdiction of the State . . . in which such place is situated, . . .
> shall be guilty of a like offense and subject to like punishment.

Plaintiffs' principle argument is that 39 C.F.R.S 232.1 (entitled "Conduct on Postal Property") represents a detailed federal enactment that fully regulates activities conducted on postal property and, thus, preempts related state laws.

In Lewis v. United States, 523 U.S. 155, 118 S. Ct. 1135, 1141-42 (1998), the Supreme Court held that, where a congressional enactment applies to the act or omission at issue, courts must determine whether the "applicable federal law indicate[s] an intent to punish conduct such as the defendant's to the exclusion of the particular state statute at issue." If not, then the state criminal statute is applicable, notwithstanding the fact that the crime occurred in a federal enclave. In this case, the relevant legislative intent could not be clearer. Subsection (p)(2) of the postal regulations expressly provides that "[n]othing contained in these rules and regulations shall be construed to abrogate . . . any State and local laws and regulations applicable to any area in which the property is situated." 39 C.F.R. S 232.1(p)(2). Given such a clear statement, we have no trouble concluding that New Jersey's trespass laws are applicable to plaintiffs' conduct.

the arrest, they not only subjectively believed (i.e., "knew") that they were privileged to distribute leaflets on the sidewalk, but that Paff explained this belief to both Leddy and Kaltenbach. In addition, plaintiffs contend that the undisputed facts reveal no evidence that Konek "knew" anything different. Thus, according to plaintiffs, all of the evidence available to Kaltenbach at the time of the arrest established that Paff and Konek believed that they were constitutionally privileged to remain on the property and, as a result, there was insufficient evidence from which Kaltenbach could have found probable cause as to this essential element of the offense.

Kaltenbach responds that he had probable cause to believe the plaintiffs knew they were not privileged to remain on the postal sidewalk as soon as he learned that the plaintiffs had been so advised by the postmaster. Such probable cause was reinforced, he contends, once Kaltenbach himself discussed the matter with the plaintiffs. Paff informed him that he was the "designated arrestee," thereby indicating that advance consideration had been given to the legality of the proposed protest and that the protesters recognized that law enforcement authorities might, at least under some circumstances, view it as illegal.

Probable cause to arrest exists when the information within the arresting officer's knowledge at the time of the arrest is sufficient to warrant a reasonable law enforcement officer to believe that an offense has been or is being committed by the person to be arrested. See United States v. Cruz, 910 F.2d 1072, 1076 (3d Cir. 1990). It "is a fluid concept -- turning on the assessment of probabilities in particular factual context -- not readily, or even usually, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). While probable cause to arrest requires more than mere suspicion, the law recognizes that probable cause determinations have to be made "on the spot" under pressure and do "not require the fine resolution of conflicting evidence that a reasonable doubt or even a preponderance standard demands." Gerstein v. Pugh, 420 U.S. 103, 121 (1975). A " `common sense' approach [must be taken] to the issue of probable cause" and a determination as to its existence must be based on "the

16

totality of the circumstances." Sharrar v. Felsing, 128 F.3d 810, 818 (3d Cir. 1997).

The leading Supreme Court case on the application of the doctrine of qualified immunity in the context of a determination of probable cause is Anderson v. Creighton, 483 U.S. 635 (1987). The Court there noted "the difficulty of determining whether particular searches or seizures comport with the Fourth Amendment." Id. at 644. Because reasonable minds can differ on whether particular arrests meet the imprecise standards of probable cause we have just discussed, the Court recognized that not every determination that probable cause was lacking requires a finding that the arresting officer is liable for damages. Room must be provided for reasonable mistakes. As the Court put it:

> We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials -- like other officials who act in ways they reasonably believe to be lawful -- should not be held personally liable.

Id. at 641.

The Anderson Court noted the general rule that "whether an officer protected by qualified immunity may be held personally liable for an allegedly unlawful action generally turns on the `objective legal reasonableness' of the action . . . assessed in light of the legal rules that were clearly established at the time it was taken." Id.  at 639. It then explained that in the context of a probable cause determination, a determination regarding whether the relevant law was clearly established must take into account the specific circumstances that confronted the officer. "[T]he right the official is alleged to have violated must have been `clearly established' in a . . . particularized .. . sense. The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to

17

say that in the light of pre-existing law the unlawfulness must be apparent." Id. at 640.

We understand Anderson to require us to look at the circumstances that confronted Kaltenbach and to compare the circumstances present in those cases which have concluded that there was an absence of probable cause. If there are cases that would make it "apparent " to a reasonable officer in Kaltenbach's position that probable cause was lacking, qualified immunity is not available. Id. (emphasis added). If not, Kaltenbach is entitled to qualified immunity. As the Anderson Court noted, "qualified immunity protects `all but the plainly incompetent or those who knowingly violate the law.' " Id. at 638 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Absent a confession, the officer considering the probable cause issue in the context of crime requiring a mens rea on the part of the suspect will always be required to rely on circumstantial evidence regarding the state of his or her mind. Ordinarily, information supporting a conclusion that the potential defendant in a trespass case was not licensed or privileged and that he was so advised by the custodian of the property will provide sufficient circumstantial evidence to constitute probable cause on the mens rea element. Moreover, this will normally be true even where the potential defendant, upon being confronted by a law enforcement officer, makes a claim of entitlement to be on the premises.

Kaltenbach learned information prior to the arrest which provided probable cause to believe that Paff and Konek were not licensed or privileged and that they had been so advised by the custodian of the property. What makes the probable cause/mens rea issue more difficult here than in most trespass cases are the facts that this was public property, Paff and Konek were engaged in expressive activity, and they expressly purported to be acting on legal advice specifically addressed to the issue of license or privilege.

Kaltenbach was required to make a judgment call regarding plaintiffs' state of mind. Paff and Konek told Kaltenbach that they believed they were entitled to be

leafleting on the sidewalk and offered a plausible explanation for that belief. Nevertheless, we find nothing in the probable cause jurisprudence that makes it apparent that Kaltenbach was required to accept that assertion at face value. The existence of a "designated arrestee" indicated that Paff and Konek realized that there were circumstances under which their planned conduct might be viewed as illegal by law enforcement authorities, and they had been advised by the postmaster that their conduct, if continued through the evening, was likely to lead to an obstruction of post office patrons. A belief in the general right to leaflet on post office property is not inconsistent with knowledge that potentially obstructive conduct is illegal.

Kaltenbach had to make a judgment based on circumstantial evidence. The issue was close enough that there was the potential of a court subsequently determining that he made the wrong choice. In light of the clearly established law and the information available to him, however, his choice was not objectively unreasonable and suggests neither that he was incompetent nor that he knowingly violated the law. Accordingly, we conclude that he is entitled to qualified immunity.

IV.

Accordingly, we will affirm the order of the District Court granting summary judgment to Kaltenbach on all counts.

19

COWEN, Circuit Judge, dissenting.

In this appeal we must decide whether a police officer is entitled to qualified immunity when, on the night federal income taxes were due, he arrested John Paff and James Konek, who stood on a sidewalk outside a post office, handing out leaflets protesting the government's taxation policies. At the time of the arrests peaceful leafleting on a postal sidewalk was indisputably legal: the controlling postal regulation does not ban leafleting and instead only prohibits disorderly conduct and soliciting alms or contributions. See 39 C.F.R. S 232.1. If there were any doubt about how to interpret this regulation, we have previously said, while upholding the ban on solicitation, that protesters can distribute leaflets:

> [Protesters] may publicly express their views while on postal property, they may distribute political literature, and engage patrons in any lawful dialogue. In fact, they may even solicit financial contributions immediately outside postal premises, and perhaps even on certain portions of postal property. They are simply required not to engage in solicitations at a place where such activities would obstruct necessary and nonpolitical post office operations.

United States v. Bjerke, 796 F.2d 643, 652-63 (3d Cir. 1986). The availability of leafleting was important to our decision in Bjerke because in upholding the regulation's ban on solicitation we relied in part on the fact that leafleting and other types of expressive activity remain legal. Id. at 650.

Several years after Bjerke five Justices on the Supreme Court also interpreted the relevant postal regulation to allow peaceful leafleting, and the remaining four Justices never maintained that the regulation prohibits it. In Justice Kennedy's concurrence he said, "The regulation, as the United States concedes, expressly permits the respondents and all others to engage in political speech on topics of their choice and to distribute literature soliciting support, including money contributions, provided there is no in-person solicitation for payments on the premises." United States v. Kokinda, 497 U.S. 720, 738-39, 110 S.Ct. 3115,

20

3126 (1990). Much as we reasoned in Bjerke, Justice Kennedy also relied in part on the availability of these other expressive activities when he concurred in the Court's judgment that the solicitation ban was permissible. Id. at 739, 110 S.Ct. at 3126. The four Justices in dissent similarly agreed that the postal regulation permits "labor picketing, soapbox oratory, distributing literature, holding political rallies, playing music, circulating petitions, or any other form of speech not specifically mentioned in the regulation." Id. at 750, 110 S.Ct. at 3132. Even Justice O'Connor's opinion for the remaining four Justices conceded that "individuals or groups have been permitted to leaflet, speak, and picket on postal premises," and never expressly said that the regulation prohibited such conduct. Id. at 730, 110 S.Ct. at 3121.

Thus it is clearly established that under the postal regulation protesters have a legal right to hand out leaflets, provided they do not engage in disorderly conduct or solicit money to be paid on the postal premises. Because the undisputed facts show that Paff and Konek were leafleting peacefully and were not engaging in unlawful solicitation, Officer Kaltenbach did not have probable cause to arrest them, and therefore they have a valid claim under the Fourth and Fourteenth Amendment. See, e.g., Mackinney v. Nielson, 69 F.3d 1002 (9th Cir. 1995) (because California law did not prohibit individuals from writing in chalk on a public sidewalk, the officer who arrested the plaintiff was not entitled to qualified immunity from the plaintiff's Fourth Amendment claim).

The majority apparently believes that Kaltenbach had probable cause to arrest Paff and Konek because the protesters were potentially an obstruction (although the majority raises this point in its discussion of the First Amendment claim). But the regulation's prohibition of disorderly conduct can hardly be construed to make an offense out of "potentially" committing disorderly conduct. The portion of the regulation addressing disorderly conduct states,

> Disorderly conduct, or conduct which creates loud and unusual noise, or which obstructs the usual use of entrances, foyers, corridors, offices, elevators,

21

> stairways, and parking lots, or which otherwise tends to impede or disturb the public in the performance of their duties, or which otherwise impedes or disturbs the general public in transacting business or obtaining the services provided on property, is prohibited.

39 C.F.R. S 232.1(e). The majority suggests in footnote 5 of its opinion that this provision gives local postmasters discretion to decide whether someone's conduct is"likely" to violate S 232.1(e) and that police may rely on the postmaster's judgment. Nowhere in the regulation does the word "likely" appear; the provision prohibits actual disorderly conduct, not potential disorderly conduct. Not only is the majority's position unsupported by the language of the regulation, it also appears to subject members of the public to a fine or imprisonment, see S 232.1(p)(2), or arrest at a minimum, because a postmaster deems them likely to commit an offense, even though their conduct has been innocent so far. How will people know when they are potentially committing disorderly conduct as they try to enjoy their judicially recognized right to leaflet peacefully? The Supreme Court has firmly rejected laws for vagueness. See, e.g., City of Chicago v. Morales , ___ U.S. ___, 119 S.Ct. 1849 (1999); Kolender v. Lawson, 461 U.S. 352, 103 S.Ct. 1855 (1983); Papachristou v. City of Jacksonville, 405 U.S. 156, 92 S.Ct. 839 (1972). The Court has also rejected arrests for disorderly conduct when the police thought the protesters' conduct was likely to result in disorderly conduct. Gregory v. City of Chicago, 394 U.S. 111, 89 S.Ct. 946 (1969). And the Court has rejected a law that made illegal having a disposition to commit an offense. Robinson v. State of California, 370 U.S. 660, 82 S.Ct. 1417 (1962).

To appreciate the dangers of allowing arrests for "potentially" committing disorderly conduct, I think it is worth reviewing in some detail just how little evidence there is that the plaintiffs' leafleting was creating any problem. According to the undisputed facts, before Paff or Konek handed a leaflet to anyone, they first asked if the person wanted one and were not confrontational. The two only approached people leaving the post office, and were joined by a total of three other protesters, hardly creating a threatening rally. While it may seem reasonable to assume

22

that this particular post office was busy on the night taxes were due, there is no evidence or allegation that a large number of people in fact were crowding into this post office. For all we know one person passed every ten minutes. The post office in question is also set back from the road and appears, in some admittedly dark photocopied pictures in the appendix, to be surrounded by a fair amount of open land, suggesting that the protesters were not standing in close quarters. Paff stated that he and the four other protesters "stood on the sidewalk area between the parking lot and the front door of the East Brunswick Post Office" and were "within two feet" of some newspaper vending machines. App. at 60.

In the postmaster's call to the police department, he made no reference to any obstruction that the protesters were creating. A transcript of that call shows that after identifying himself, the postmaster said, "We have people on the property giving out pamphlets, we've asked them to leave the property and they won't. Could you send somebody down?" He explained that the post office was open until midnight and then made a partially inaudible remark about picket signs. "With picket signs?" the dispatcher asked. The postmaster responded, "Yes, it's a Libertarian party or something." He continued,"They can go out on public property which is out by the street so they can't be on our sidewalk in front of our front door." After the postmaster gave his name, the dispatcher said,"O . . . okay, we'll send someone out." App. at 160. This is all the relevant information the postmaster conveyed to the police dispatcher.

When Kaltenbach arrived, the postmaster again identified himself and said that the protesters could move out to Cranbury Road. On the record before us there is no evidence--or even allegation--that the postmaster told Officer Kaltenbach that the protesters had obstructed the ingress or egress of patrons of the post office, much less that the postmaster offered any evidence in support of such an allegation had it been made. At best the postmaster told Kaltenbach the protesters were a "potential obstruction,"[1]

_____

1. In Kaltenbach's statement of undisputed facts he asserts that the postmaster told him that the protesters were a "potential obstruction."

23

an assertion that by itself is insufficient to provide probable cause for the arrest and that in any event seems poorly supported, given the protesters' small numbers and their peaceful conduct.

By comparison, when the police have invoked the risk posed by a hostile audience to justify arresting protesters who were conducting an otherwise lawful demonstration, the Supreme Court has required considerably more evidence of imminent harm than was present in our case. See, e.g., Gregory v. City of Chicago , 394 U.S. 111, 89 S.Ct. 946 (1969); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453 (1965); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680 (1963); Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894 (1949). Given that the leafleting in our case was legal, I believe that there should have been much more evidence of an imminent and significant disruption before an arrest was made. "[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 508, 89 S.Ct. 733, 737 (1969); Zamboni v. Stamler, 847 F.2d 73, 78 (3d Cir. 1988).

It is also worth noting that the postmaster's suggested alternative that the protesters move out to the public road was highly problematic. As Paff explained, Cranbury Road did not have a sidewalk and was unlit (events took place at 9 p.m. on April 15th); and it was not possible to hand out leaflets to passengers in cars that Paff estimated were traveling approximately 40 miles per hour through the night. See App. at 173–74. Furthermore, although the majority suggests that the postmaster's ban on the protester's leafleting was limited to tax night, nothing in the record indicates that the postmaster said his ban was restricted in this way. He simply called the police and asked

_____

App. at 170. The appellants' response to Kaltenbach's statement of undisputed facts denies that the postmaster made that statement. App. at 180. But because Kaltenbach repeated his claim in a certification, and the certification Paff submitted did not mention whether the postmaster alleged they were a "potential obstruction," it appears that we should accept Kaltenbach's allegation for the purposes of this summary judgment motion.

24

them to remove the protesters. And even if we adopted this after the fact narrowing of the restriction, the message the protestors sought to convey was undermined when they were not allowed to conduct their protest on tax day. In the end, however, I think that even if Cranbury Road had offered a viable alternative or the postmaster had limited his ban to tax night, neither factor would be enough to justify qualified immunity; the protesters had a right to leaflet peacefully where they were.

When an officer violates clearly established law and the facts reasonably known by the officer indisputably show that the officer's conduct was illegal, qualified immunity is rarely appropriate. An officer can only obtain qualified immunity for violating clearly established law when the officer shows "extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard." In re City of Philadelphia Litigation, 49 F.3d 945, 961 (3d Cir. 1995)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 817–19, 102 S.Ct. 2727, 2738 (1982)).

Under this standard Kaltenbach's reliance on the postmaster should not constitute "extraordinary circumstances." Even reliance on the advice of counsel may not be sufficient to constitute extraordinary circumstances. See, e.g., Davis v. Zirkelbach, 149 F.3d 614, 620 (7th Cir. 1998) cert. denied, 119 S.Ct. 902 (1999); Buonocore v. Harris, 134 F.3d 245, 252–53 (4th Cir. 1998); V–1 Oil Co. v. Wyoming, 902 F.2d 1482 (10th Cir. 1990). And the burden of proving extraordinary circumstances is carried by the officer. Buonocore, 134 F.3d at 252; Cannon v. City and County of Denver, 998 F.2d 867, 874 (10th Cir. 1993). In our case the postmaster did not mention any legal authority for his action, despite the fact that Paff cited the postal regulation that he said allowed him to leaflet. Kaltenbach also did not perform so much as a cursory independent investigation to see if the protesters were posing any problem, nor did he inquire into whether their conduct actually was illegal. It is true that after arresting Paff, Kaltenbach radioed his supervisor, but even if we make the dubious assumption that this call could constitute "extraordinary circumstances," a transcript of that conversation shows that the purpose was not to obtain

25

advice on whether the leafleting was legal, but merely to advise headquarters that Kaltenbach was bringing in the arrestees. Moreover, Kaltenbach could have made additional inquiries given that, as the facts above indicate, the protesters' conduct was not creating an impending conflict requiring immediate action.

The protesters' claim under the First and Fourteenth Amendments poses closer questions. The majority operates under the assumption that unless the protesters can show that the First Amendment clearly prohibits the Postal Service from issuing any regulation prohibiting leafleting, then the protesters must lose their claim under the First Amendment. I disagree with this assumption. If the postal regulations permit leafleting, then I think the protesters have a valid First Amendment claim, even if the clearly established law does not flatly prohibit the Postal Service from banning all leafleting in the future. Much as the government cannot discriminate among speakers when it creates a limited-purpose public forum, see, e.g., Widmar v. Vincent, 454 U.S. 263, 267-68, 102 S.Ct. 269, 273-74 (1981), the government also violates the First Amendment in my view if it has people in a nonpublic forum arrested for engaging in a type of expressive activity that the government's own regulations permit. This should be especially true when the government's regulation was saved from a First Amendment challenge in part because the regulation permitted that particular type of expressive activity.

But suppose the majority is right, and the protesters must show that the First Amendment prohibits the government from issuing regulations that ban leafleting on postal sidewalks deemed to be nonpublic forums. Given that the Postal Service has not yet tried to issue such regulations, it may seem precipitate to reach this issue. The majority's view seems to require the discussion, however, so I will offer several comments on their analysis. If the protesters must show that postal regulations cannot ban leafleting, then like the majority I conclude that the protesters' First Amendment claim must fail--the relevant right is not yet clearly established. But I hasten to add that since Kaltenbach did not cross-appeal the District Court's

26

finding that the protesters had a constitutional right under the First Amendment to leaflet, under our recent decision, Assaf v. Fields, 178 F.3d 170, 174 (3d Cir. 1999), the ultimate question of whether the government does have the power to ban all leafleting is not before us.

In analyzing what is clearly established I agree with the majority that the sidewalk leading to the post office in this case is a nonpublic forum, or at least that in the wake of Kokinda the status of the sidewalk is unclear. I also agree that the government can impose reasonable restrictions on speech in a nonpublic forum, where a reasonable restriction is one that is "consistent with the[government's] legitimate interest in preserv[ing] the property . . . for the use to which it is lawfully dedicated." Majority Op. at 11 (quoting Int'l Society for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 688, 112 S.Ct. 2711, 2712 (1992) and Perry Educ. Ass'n v. Perry Local Educators Ass'n, 460 U.S. 37, 50–51, 103 S.Ct. 948, 958 (1983)).

My reasoning differs from the majority's, however, because I rely exclusively on two doctrinal points to conclude that the relevant right is not clearly established. First, Kokinda plainly left the issue unresolved. Second, and much more crucially, when the Supreme Court rejected a ban on leafleting in Lee, Justice O'Connor's concurrence emphasized that the airport in question was run in part as a shopping mall, supporting many activities, and therefore was unlike other nonpublic forums considered by the Court, such as the postal sidewalk in Kokinda  in particular. See Lee, 505 U.S. at 688–89, 112 S.Ct. at 2712–73. Given the airport's multiple uses, Justice O'Connor's opinion judged leafleting to be consistent with the functions of the forum.

After reviewing this caselaw, a reasonable official could conclude that postal sidewalks are designed simply to give access to the post office and that, therefore, Lee's protection of leafleting did not apply and Kokinda does not require otherwise. These points alone are sufficient, I believe, to defeat the claim that it is clearly established that the First Amendment prohibits the government from implementing regulations that ban leafleting on postal sidewalks deemed to be nonpublic forums. One does not need to bring in the

27

majority's points about the protesters posing a potential obstruction or about police officers delegating their decisionmaking to a postmaster. Neither of these latter factors would justify granting qualified immunity if the relevant right were otherwise clearly established.

But in the end whatever the power of the Postal Service is to ban leafleting on its sidewalks, the fundamental point in this case is that no such ban has been implemented. Leafleting is clearly legal under the Postal Service's regulations, and therefore I cannot agree that Kaltenbach is entitled to qualified immunity on the plaintiffs' claims under the First, Fourth, and Fourteenth Amendments. The plaintiffs' leafleting and criticism of the government should not have been suppressed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit